UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SPRINGFIELD LIBRARY AND         )
MUSEUM ASSOCIATION, INC.,        )
                       Plaintiff    )
                                  )
          v.                     )     Civil Action No. 03-30219-MAP
                                  )
KNOEDLER ARCHIVUM, INC. f/k/a,   )
M. KNOEDLER & COMPANY, INC.,     )
                       Defendant   )

REPORT AND RECOMMENDATION REGARDING DEFENDANT'S
MOTION FOR JUDGMENT ON THE PLEADINGS (Document No. 4)
March 1, 2004

NEIMAN, U.S.M.J.

     This case concerns the 1955 purchase by the Springfield Library and Museum Association ("Plaintiff") of a painting from Knoedler Archivum, Inc. f/k/a M. Knoedler & Company, Inc. ("Defendant"). In 2001, Plaintiff returned the painting to the Italian government which claimed that it had been stolen from its embassy in Poland during World War II. In this action, Plaintiff asserts various contractual claims against Defendant. Arguing that Plaintiff's claims are time barred, Defendant has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The motion has been referred to this court for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B). For the reasons indicated below, the court will recommend that Defendant's motion for judgment on the pleadings be denied.

I. BACKGROUND

There is no genuine dispute as to the following background facts. Further material facts are described in the court's discussion below.

In 1955, Plaintiff, for $5,000, purchased from Defendant a painting entitled *Spring Sowing* by the Italian artist Jacopo da Ponte. The bill of sale stated that Defendant "covenant[s] with the grantee that it [is] the lawful owner of the said goods and chattels; that they are free from all encumbrances; that it have [sic] good right to sell same as aforesaid; and that it will warrant and defend the same against lawful claims and demands of all persons." (Document No. 13, Exhibit A.)

A decade later, on January 11, 1966, Dr. Bruno Molajoli, Director General of the Arts for the Italian government, wrote to Frederick Robinson, Plaintiff's museum director. He claimed that *Spring Sowing* belonged to the Uffizi, a well-known museum in Florence, Italy, had been loaned to the Italian Embassy in Poland in 1935, and was lost during World War II. He asked Plaintiff to return the painting voluntarily and thus obviate the need for formal action. Robinson, in turn, wrote to E. Coe Kerr, Defendant's president, alerting him to Molajoli's request and asking him to provide early records of the painting. Robinson also expressed a wish that Defendant verify the "accuracy of [the Italian government's] statement." (Document No. 13, Exhibit D.)

On February 8, 1966, Robinson wrote to Helmut Ripperger, Defendant's librarian, sharing his belief that the Italian government might be mistaken because "the Uffizi painting is a much smaller version than ours." (Document No. 13, Exhibit E.) On February 9, Ripperger wrote that "[c]omparing the Uffizi photograph with our own, there seems to be

2

little doubt that they are one and the same painting." "Nonetheless," he continued, "there are still areas of confusion in addition to the official size as claimed by the Uffizi." (Document No. 13, Exhibit F.)  Ripperger also raised questions as to the previous locations of the painting claimed by the Italian government.

In May of 1966, Ripperger again wrote to Robinson, stating this time that the Italian government had offered no evidence that the painting was actually in its embassy in Poland in 1935 nor any evidence supporting the circumstances of its disappearance. Ripperger also stated that, "[a]lthough I have a sneaking suspicion that you and I feel that we are dealing with one and the same picture, I for one am not ready to give up the ghost." He encouraged Robinson to "keep on fighting."  (Document No. 13, Exhibit F.)

Between January 11 and September 21, 1966, Robinson also corresponded directly with the Italian government attempting to resolve discrepancies and obtain concrete proof of the claim.  Motivated in part by the questions raised by Defendant, Robinson requested embassy inventories, dates when the theft was reported to either Polish or Italian authorities, as well as other indicia of ownership.  The Italian government did not respond to Robinson's third such request and, for over thirty years, made no new demand for the return of the painting.

In October of 2000, however, the Italian government again requested the return of *Spring Sowing*, and on June 22, 2001, for reasons not apparent in the record, Plaintiff complied.  Plaintiff thereupon demanded compensation from Defendant, which demand was refused.

The instant complaint -- originally filed on August 6, 2003, in state court and later removed to this court pursuant to 28 U.S.C. § 1441 -- has been amended twice. It currently charges Defendant with breach of contract (Count I), breach of implied warranty (Count II), fraud and deceit (Count III), negligent and innocent misrepresentations (Counts IV and V), breach of the covenant of good faith and fair dealing (Count VI), and a violation of Mass. Gen L. ch. 93A, §§ 2, 11 (Count VII).

## II. JUDGMENT ON THE PLEADINGS STANDARD

When addressing a Rule 12(c) motion, a court should typically consider only information and materials contained in the pleadings. *See Gulf Coast Bank & Trust Co. v. Reder,* 355 F.3d 35, 38 (1st Cir. 2004); *Feliciano v. State of R.I.*, 160 F.3d 780, 788 (1st Cir. 1998). Here, as confirmed at oral argument, the parties have agreed that Plaintiff's Second Amended Complaint and Defendant's Answer constitute the pleadings to be considered. *See Grubbs v. Smith,* 86 F.2d 275, 275 (6th Cir. 1936) (stating that in considering a judgment on the pleadings, "as a matter of law the amended and substituted petition superseded the prior pleadings in the case"). The parties have also agreed that the court should consider exhibits from the first two complaints and answers, as well as the other documents appended to the briefs as having been incorporated into these pleadings, but neither party desires the court to convert the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(c) (last sentence). *Cf. Gulf Coast Bank & Trust*, 355 F.3d at 38-39 (affirming conversion where Rule 12(c) movant presented evidence outside the pleadings and nonmovant was also given opportunity to produce additional materials).

It has been observed that "[a] limitations defense is a classic example of an issue which may, in a proper case, be determined by a Rule 12(c) motion." *Linder v. Berge*, 577 F. Supp. 279, 280 (D.R.I. 1983) (citations omitted), *aff'd* 739 F.2d 686 (1st Cir. 1984). *See also LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). However, "because rendition of judgment in such an abrupt fashion represents an extremely early assessment of the merits of the case, the trial court must accept all of the nonmovant's well-pleaded factual averments as true and draw all reasonable inferences in [its] favor." *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (citations omitted). At bottom, a Rule 12(c) motion should be granted only if it appears "beyond doubt" that the plaintiff can prove no set of facts which would entitle it to relief. *Id.*

### III. DISCUSSION

Defendant's central argument is that Plaintiff's causes of action are all time barred. In response, Plaintiff claims that the limitations period, whatever that may be, should be suspended or estopped on a variety of equitable theories.[1] In analyzing Defendant's motion, the court will first define Plaintiff's claims and the applicable limitations period. It will then discuss Plaintiff's equitable theories. Finally, the court will consider a separate

---

[1] Plaintiff also argues that judgment on the pleadings is not appropriate because "genuine issues of material fact" remain in dispute. While such summary judgment language is used in a few Rule 12(c) decisions, *see, e.g., Tavares de Almeida v. Children's Museum*, 28 F. Supp. 2d 682, 685 (D. Mass. 1998) (citing Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1367); *Geupel v. Benson*, 704 F. Supp. 312, 313 (D. Mass. 1989), the court will assume here that Plaintiff's well-pleaded facts are true and will resolve any disputes in its favor.

argument Defendant makes with respect to Plaintiff's claim under Mass. Gen. L. ch. 93A ("chapter 93A").  In the end, the court will recommend that Defendant's motion be denied.

A. <u>Defining the Claims and the Limitations Period</u>

As an initial matter, Defendant asserts that while some of Plaintiff's claims sound in tort, they are all actually varied expressions of contractual breaches of warranty.  The court agrees.  The core of Plaintiff's complaint is that it did not receive what it contractually bargained for, i.e., a painting with impeccable provenance and for which Defendant had good title.  This is a classic case of a contractual breach of warranty and needs to be treated as such.  *See Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co.*, 533 N.E.2d 1350, 1353 (Mass. 1989) ("[W]hen [contract-based] economic loss is the only damage claimed, recovery is not allowed in tort-based strict liability . . . or in negligence."); *Wilson v. Hammer Holdings, Inc.*, 850 F.2d 3, 8 (1st Cir. 1988) (purchaser's negligence claim against seller gallery, for not realizing that a painting was a forgery, was actually a contract claim).[2]

---

[2] This is not, however, a classic case in the world of art stolen during World War II. Such cases usually involve claims by original owners of the art against those who have come to possess it in the years following the war.  *See, e.g., Kunstammlungen Zu Weimar v.Elicofon*, 536 F. Supp. 829 (E.D.N.Y. 1981), *aff'd*, 678 F.2d 1150 (2d Cir. 1982); *Menzel v. List*, 253 N.Y.S.2d 43 (N.Y. App. Div. 1964). *See also* Steven A. Bibas, *The Case Against Statutes of Limitations for Stolen Art*, 103 Yale L.J. 2437 (June 1994); Emily J. Jenson, *The Last Prisoners of War: Returning World War II Art to its Rightful Owners -- Can Moral Obligations be Translated into Legal Duties?*, 51 DePaul L. Rev. 1103 (Summer 2002).  At least one case, however, involved a claim against an art dealer -- in fact, the same defendant here -- by the purchaser of a painting subsequently discovered to have been looted during World War II.  *See Rosenberg v. Seattle Art Museum,* 124 F. Supp. 2d 1207 (W.D. Wash. 2000), *and* 42 F.Supp.2d 1029 (W.D. Wash. 1999)

The claims so defined, the court must next determine the appropriate limitations period in accordance with "the local law of the forum." *Henric v. Reed & Prince Mfg. Co.*, 739 F.2d 1, 2-3 (1st Cir. 1984)). Under the common law in effect in Massachusetts in 1955, the limitations period for claims arising out of a sale of something to which the seller did not have proper title generally began to run at the time of the sale. *Perkins v. Whelan*, 116 Mass. 542, 543-44 (1875). *See also Boston Towboat Co. v. Medford Nat'l Bank*, 121 N.E. 491, 492-93 (Mass. 1919) ("[T]he general rule is cases of breach of contract is that the statute begins to run from the time of the breach."). Accordingly, unless the triggering date was somehow delayed by the discovery rule -- which the court does not believe to be the case (see *infra*) -- Plaintiff's claims against Defendant accrued in 1955.

Relying on this accrual date, Defendant, citing the Uniform Commercial Code ("UCC")'s four-year statute of limitations for breach of contract actions concerning the sale of goods, *see* Mass. Gen. L. ch. 106, § 2-725, argues that Plaintiff had to file its claims by 1959. As Defendant recognizes, however, the UCC was not adopted in Massachusetts until 1957, two years after the sale. Further, the bill of sale, by its own terms, was "signed and sealed." (Document No. 13, Exhibit A. See also Second Amended Complaint ¶ 7 ("The Bill of Sale is signed under seal.").) Accordingly, Plaintiff's contractual claims are actually subject to the twenty-year limitations period for sealed instruments codified in Mass. Gen. L. ch. 260, § 1. *See Nalbandian v. Hanson Rest. & Lounge, Inc.*, 338 N.E.2d 335, 335 n.2 (Mass. 1975) (holding that language in an agreement that recited that it was "[s]igned and sealed" was sufficient to give the instrument the legal effect of a sealed instrument by virtue of Mass. Gen. L. ch. 4,

7

§ 9A [3]). It follows, then, that Plaintiff either needed to have filed its claim against Defendant by 1975 (twenty years after the purchase) or must point to an event or events that tolled or estopped the statutory period at some juncture within that twenty year period.

B. Analysis of Plaintiff's Arguments

Plaintiff argues that Defendant's statute of limitations defense should be defeated based on the discovery rule, tolled because of fraudulent concealment or estopped on equitable grounds.[4] The court will address each argument in turn. In the end, the court believes that there are sufficient facts, at this early stage of the case, to infer that Defendant should be equitably estopped from defeating Plaintiff's claims on statute of limitations grounds.

1. Discovery Rule

Plaintiff first argues that the discovery rule delayed the 1955 accrual date. The court disagrees.

---

[3] In pertinent part, section 9A, states as follows:

> In any written instrument, a recital that such instrument is sealed by or bears the seal of the person signing the same or is given under the hand and seal of the person signing the same, or that such instrument is intended to take effect as a sealed instrument, shall be sufficient to give such instrument the legal effect of a sealed instrument without the addition of any seal of wax, paper or other substance or any semblance of a seal by scroll, impression or otherwise.

Mass. Gen. L. ch 4, § 9A.

[4] Plaintiff also mentions the "Doctrine of Equitable Tolling" in its brief. That phrase, however, usually describes either fraudulent concealment or equitable estoppel *see, e.g., Protective Life Ins. Co. v. Sullivan*, 682 N.E.2d 624, 633 (Mass. 1997), both of which the court addresses below.

Under the discovery rule, when an injury is "inherently unknowable," a statute of limitations starts to run only "when an event or events have occurred that [are] reasonably likely to put the plaintiff on notice that someone may have caused [the] injury." *Bowen v. Eli Lilly & Co.*, 557 N.E.2d 739, 741 (Mass. 1990). *See also Taygeta Corp. v. Varian Assocs., Inc.*, 763 N.E.2d 1053, 1063 (Mass. 2002). Unfortunately for Plaintiff, however, it does not appear that the discovery rule applies in a contractual breach of warranty case such as this. *See Wilson*, 671 F. Supp. at 96-97, *aff'd*, 850 F.2d at 6-7. *See also Perkins*, 116 Mass. at 542 (holding that it was "immaterial" that the plaintiff claimed "to have no knowledge of any defect in his title" until after the limitations period had run). Thus, as indicated, the court has concluded that Plaintiff's claims did in fact accrue in 1955.

2. <u>Fraudulent Concealment</u>

Undeterred, Plaintiff next argues that the doctrine of fraudulent concealment saves its claims. The court, however, finds that argument unpersuasive as well.

Under the federal common law of fraudulent concealment, the tolling of a statute of limitations may be warranted where a defendant "engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and [where] the plaintiff . . . failed to discover these facts within the normal limitations period despite his exercise of due diligence." *Torres Ramirez v. Bermudez Garcia*, 898 F.2d 224, 229 (1st Cir. 1990) (citation and internal quotation marks omitted). *See also Salois v. Dime Sav. Bank of N.Y., FSB*, 128 F.3d 20, 25 (1st Cir. 1997). The doctrine is also codified in the General Laws of Massachusetts:

> If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

Mass. Gen. L. ch. 260, § 12. A cause of action cannot be deemed to have been fraudulently concealed, however, if the plaintiff "'ha[d] knowledge of the facts that create[d] it.'" *White v. Peabody Constr. Co.,* 434 N.E.2d 1015, 1022 (Mass. 1982) (quoting *Stetson v. French*, 72 N.E.2d 410, 412 (Mass. 1947)).

Although Plaintiff mentions fraudulent concealment, it has produced insufficient facts or allegations, in the court's opinion, to indicate or even infer that Defendant acted fraudulently in concealing Plaintiff's causes of action, either at the time Defendant sold Plaintiff the painting in 1955 or when the Italian government first made demand for its return in 1966. In the absence of such pleading and proof, the court is unconvinced, at this time, that the doctrine of fraudulent concealment may be used to toll the limitations period.

Of course, the absence of such pleading or proof does not mean that Plaintiff's fraud-based counts (e.g., Counts III and VII) need to be dismissed outright, perhaps pursuant to Fed. R. Civ. P. 9(b). Not only is that question not before the court, the complaint appears to adequately allege at least two instances of fraud.[5] The court's only

---

[5] First, the complaint alleges that "[p]rior to the sale . . ., [Defendant] represented . . . that it had examined *Spring Sowing*'s provenance and that [Defendant] maintained clear title to sell *Spring Sowing* to [Plaintiff]," (Complaint ¶ 9), namely, that the painting came from "a Swiss lady in whose family the picture had remained for a very long time," (Document No. 13, Exhibit A) *See* Barry Meier and Martin Gottleib, *Along the Antiquities Trail: Illicit Journey out of Egypt with few Questions Asked*, N.Y. Times, Feb. 23, 2004, at A1 (noting that antiquities "dealers . . . sometimes used th[e] argument [that many pieces without clear provenance are still perfectly legitimate, having been purchased by collectors

point is that the distinct doctrine of "fraudulent concealment" appears to be an insufficient basis upon which to defeat Defendant's statute of limitations argument.

    3. Equitable Estoppel

As a final matter, Plaintiff argues that Defendant should be equitably estopped from claiming the protection of the statute of limitations since in 1966 -- well within the twenty year limitations period -- Defendant encouraged Plaintiff to challenge and frustrate the Italian government's attempt to regain *Spring Sowing.* On this score, the court finds Plaintiff's position persuasive, at least for purposes of the present motion.

"Equitable estoppel is a judicially-devised doctrine which precludes a party to a lawsuit, because of some improper conduct on that party's part, from asserting a claim or defense, regardless of its substantive validity." *FDIC v. Roldan Fonseca*, 795 F.2d 1102, 1107 (1st Cir. 1986). A limitations period, under Massachusetts case law, may be equitably estopped when the "defendant 'made representations [it] knew or should have known would induce the plaintiff to put off bringing suit and . . . the plaintiff did in fact delay in reliance on the representations.'" *Riley v. Presnell*, 565 N.E.2d 780, 787 (Mass. 1991) (citations omitted). *See also Ford v. Rogovin*, 194 N.E. 719, 721 (Mass. 1935) (equitable estoppel may be claimed when "statements of the defendant lulled the plaintiff into the false

---

before countries began restricting trade] as a sort of wink-and-nod cover story, describing questionable pieces as coming from, say, an . . . 'old Swiss' collection"). *See also* Michelle Kuntz, *Switzerland & The International Trade in Art & Antiquities*, 21 Northwestern J. of Int. Law & Bus. 519, 520 (2001) (describing Switzerland "as perhaps the single most important player" in the illicit trade of art and antiquities). Second, it does not appear from the complaint that Defendant ever responded to Plaintiff's request on January 17, 1966, to provide "any early records . . . you may have still retained concerning the [painting]." (Complaint ¶ 12.)

belief that it was not necessary. . . to commence action within the statutory period of limitations . . ., that the plaintiff was induced by these statements to refrain from bringing suit, as otherwise [the plaintiff] would have done, and was thereby harmed, and that the defendant 'knew or had reasonable cause to know that such consequence might follow.'").

As the facts now stand, it appears that Defendant may well have made representations it knew or should have known would induce Plaintiff to put off bringing suit. For example, at the time the Italian government first made claim to the painting in 1966, Defendant encouraged Plaintiff to continue asking for additional information. Defendant also pointed out inconsistences in the Italian government's description of the painting and questioned whether there was any actual evidence of its theft. For example, in a September 14, 1966 letter to Robinson, Ripperger stated that "I have little knowledge of such things, but I feel positive that any court of law, either here or abroad, would demand such evidence." Also, as described, Ripperger told Robinson in May of 1966 not "to give up the ghost" and to "keep on fighting." After all, as described, Defendant had represented to Plaintiff in its bill of sale that *Spring Sowing* had been in the possession of a Swiss family "for a very long time."[6]

---

[6] To be sure, questions may be raised about *Plaintiff's* actions in 1966 in response to the Italian government's claim of ownership. *See* Patty Gerstenblith, *Acquisition and Deacquisition of Museum Collections and the Fiduciary Obligations of Museums to the Public*, 11 Cardozo J. of International and Comparative Law, 409, 411 (2003) (proposing that the restitution of art objects to their proper owners does not violate a museum's trustee's fiduciary obligations). However, as indicated, the court has accepted Plaintiff's well-pleaded factual averments as true and has drawn all reasonable inferences in its favor. *See Rivera-Gomez*, 843 F.2d at 635.

Moreover, it can be inferred from the record that Defendant, an experienced art dealer, knew or should have known that Plaintiff would rely on Defendant's statements and, in turn, delay pursuing any claims it had against Defendant. This is evidenced by Plaintiff's letters to the Italian government asking for the very information Defendant thought pertinent. In short, as the facts now stand, it appears that Defendant took active steps to forestall any claim which Plaintiff might have pursued directly against it and, therefore, that equitable estoppel may apply. *See also Bergeron v. Mansour,* 152 F.2d 27, 30 (1st Cir. 1945) (finding it "unconscionable" to permit a defendant to take advantage of his own inequitable conduct).

Nevertheless, Defendant argues that its actions did not continue past 1966 and that, accordingly, any "tolling" of the statute of limitations would have ceased within that year. The court does not agree. For one thing, the two cases upon which Defendant relies for this proposition are distinguishable. In both, the plaintiff was left waiting for the defendant to take a particular action that never occurred and the parties themselves never came to a promised resolution. *See Deisenroth v. Numonics Corp.,* 997 F. Supp. 153, 157 (D. Mass. 1998) (no tolling where negotiations promising settlement ended one-year prior to the expiration of the limitations period); *Ford*, 194 N.E. at 720-721 (statute of limitations did not toll beyond its expiration when defendant's promises to make sure his insurance company would settle the claim stopped well before the end of the limitation period). Here, in contrast, Defendant encouraged Plaintiff to challenge the Italian government in the hope that the painting would never have to be returned. In fact, the challenge proved successful for thirty-four years. Thus, once the Italian government

13

stopped pursuing the painting in late 1966, Plaintiff could reasonably have believed, as Defendant had told it, that the Italian government did not have enough evidence to pursue its claim. In turn, Plaintiff could reasonably have been lulled into a false sense of security that it need not pursue any derivative claim against Defendant.

Further, and perhaps more importantly, the equitable *tolling* doctrine on which Defendant actually relies is, in the court's opinion, quite distinguishable from Plaintiff's equitable *estoppel* claim. *See Rivera-Gomez*, 843 F.2d at 633 n.3. In appropriate cases, the equitable tolling doctrine permits a plaintiff to avoid the bar of a statue of limitations if despite due diligence it is unable to obtain necessary information bearing on its claim. *See Gonzalez v. United States*, 284 F.3d 281, 291-92 (1st Cir. 2002). If applied, the doctrine merely suspends the statute of limitations for a reasonable time after discovery of the claim so as to allow a plaintiff to commence suit in a timely manner. *See id.* The doctrine of equitable estoppel, in contrast, is available when a defendant lulls a plaintiff into a false belief that it is not necessary to commence suit within the statutory period. *See Ford*, 194 N.E. at 720. As distinct from equitable tolling, the successful invocation of equitable estoppel can provide a plaintiff with the full statutory period. *See Johnson Controls, Inc., v. Exide Corp.*, 129 F. Supp.2d 1137, 1144 (N.D. Ill. 2001). More to the point, equitable estoppel bars a defendant from benefitting from its own wrongdoing. Thus, the doctrine would not simply suspend the statute, as Defendant argues, for the short period in 1966 when Defendant actively encouraged Plaintiff not to return the painting to Italian authorities.

Granted, this case differs from a typical estoppel scenario. *Compare, e.g.*, *Bergeron*, 152 F.2d at 30 (equitably estopping defendant from relying on statute of limitations when it assured the plaintiff that she need not consult a lawyer, that it would settle all her bills, and that it would compensate her for pain and suffering); *Hayes v. Gessner*, 52 N.E.2d 968, 969 (Mass. 1944) (similar). Nonetheless, the facts of this case, as presently known, appear to fall sufficiently within the elements of equitable estoppel as to allow the action to survive Defendant's limitations argument. *See also Adams v. California Mut. Bldg. & Loan Ass'n*, 116 P.2d 75, 76 (Cal. 1941) (equitable estoppel appropriate where defendant continuously represented that decision in another lawsuit would be determinative of the issues in the parties' dispute and where plaintiff relied on such representations in not instituting his own lawsuit within the limitations period.)

The court respects Defendant's attempt to end the matter via a judgment on the pleadings. However, in the court's estimation, the record does not permit it. Put differently, the court cannot say, "beyond doubt," that Plaintiff will be unable to prove a set of equitable estoppel facts that will overcome Defendant's limitations argument and, perforce, entitle Plaintiff to relief. While the court may not presently be able to say with absolute certainty that Plaintiff's claims are timely, it cannot, at this early stage, say that they are time-barred. Accordingly, the court will recommend that judgment on the pleadings not enter.

C. CHAPTER 93A

As a final and independent argument, Defendant contends that Count VIII, Plaintiff's chapter 93A claim, ought to be dismissed since that statute did not become effective until

March 26, 1968, well after the events at issue. See Mass. Stat. 1967, ch. 813. Chapter 93A affects substantive rights and, therefore, cannot be held retroactive. See *Lewis v. Ariens Co.*, 751 N.E.2d 862, 868 n. 19 (Mass. 2001); *Commonwealth v. DeCotis*, 316 N.E.2d 748, 755 (Mass. 1974). Accordingly, as Defendant asserts, Plaintiff will be unable to recover for any unfair or deceptive act that occurred prior to chapter 93A's effective date. Nonetheless, the complaint does allege that Defendant took at least some untoward actions in December of 2001 when chapter 93A did apply. (See Complaint ¶¶ 23, 24.) That is sufficient for purposes here. Accordingly, the court will recommend that judgment on the pleadings not enter on Plaintiff's chapter 93A claim.

## IV. Conclusion

For the reasons stated, the court recommends that Defendant's motion for judgment on the pleadings be DENIED.[7]

---

[7] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order

DATED: March 1, 2004

                                                     /s/ Kenneth P. Neiman
                                                    KENNETH P. NEIMAN
                                                    U.S. Magistrate Judge

---

entered pursuant to this Report and Recommendation.  *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.